No. 20,460.

SCHOOL DISTRICT NO. 1, ADAMS COUNTY, *v.*
UTILITY SERVICES, INC.
(390 P. [2d] 79)

Decided March 9, 1964.

Messrs. GAUNT, BYRNE & DIRRIM, for plaintiff in error.

Messrs. BARBARY & BATE, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE MCWILLIAMS delivered the opinion
of the Court.

THE issue to be resolved is whether School District
No. 1 in Adams County, hereinafter referred to as the

School District, is indebted to Utility Services, Inc., hereinafter referred to as Utility, for a share of the total cost of constructing water mains, sewers, grading of streets, and construction of curbs and gutters in a housing development known as Dream House Acres. The trial court decreed that the School District was so indebted and entered judgment in favor of Utility in the amount of $11,187.20. By writ of error the School District now seeks reversal of said judgment.

As of July 29, 1955, Northfield Co., a Colorado corporation hereinafter referred to as Northfield, owned a tract of raw land situate in Adams County and consisting of approximately 215 acres. On July 29, 1955, Northfield, being "desirous of having the Contractor [i.e. Utility] construct an off-site sanitary sewer line, . . . and do a certain amount of work in connection with the project, more specifically described as streets, curb and gutter, curb pans, overlot grading, asphalt paving and gravel base, project sewer and water lines, 775 sewer and water house services and 5230 linear feet of 15 inch trunk sewer," entered into a written contract with Utility whereby Utility agreed to perform said work and Northfield agreed to pay Utility the sum of $905,709.75 in return therefor. The contract further provided that the sum of $905,709.75 represented the "estimated cost of utilities per lot [as] . . . $939.69 per site" and that "the above prices per site, as specified, shall be used in all events for payments as the work progresses and shall be determinative rather than the original approximate price of $905,709.75."

Northfield later conveyed this acreage to Dream House Acres, Inc., a Delaware Corporation hereinafter referred to as Dream House, and at the same time assigned its interest under the aforementioned contract with Utility to Dream House. Thereafter this acreage became known as Dream House Acres.

Dream House then donated approximately 8 acres of land in Dream House Acres to the School District,

with Dream House "absorbing" the per lot charge for utilities on the land so donated. The School District, however, desired more acreage and from 1957 to 1959 there were numerous discussions and negotiations between Dream House and the School District concerning the possible purchase by the School District of additional land. All of this came to a culmination when the School District purchased an additional 7 acres from Dream House and the present controversy concerns the terms and conditions of this purchase. The more precise issue is who owes Utility the "per lot charge" for services rendered by it under the aforementioned contract in connection with the 7 acres purchased by the School District from Dream House. Some of the services required of Utility under the contract, though not all, had been rendered prior to the purchase of this 7 acres by the School District.

Utility brought the instant action against the School District, the individual directors of the School District and Dream House for the sum of $17,465.20, claiming that this sum was due and owing under the aforementioned contract. More specifically it alleged that this sum represented the per lot charge for utility installations for the 7 acres of land purchased by the School District from Dream House in 1959 and that in purchasing this 7-acre tract from Dream House the School District "expressly or impliedly agreed to . . . pay to . . . [Utility] the obligation of Dream House Acres, Inc."

The individual directors of the School District and Dream House denied liability and Dream House, by way of cross-claim against the School District, alleged that when the present controversy arose it offered to return to the School District the sum paid for the land and in turn requested that the School District reconvey the property back to it. Parenthetically, the record does disclose that such an "offer" was in fact made by Dream House, but that it was refused by the School District,

the latter apparently preferring to stand on its "bargain."

Back to the pleadings, the School District generally denied any obligation to Utility and filed a counterclaim against Utility wherein it alleged that Utility had unlawfully removed dirt from School District property and in connection therewith sought $50,000 as actual damages and $20,000 as exemplary damage. Utility in turn filed a "counterclaim" to this counterclaim, alleging that in removing the aforementioned dirt it actually conferred a benefit to the School District and was entitled to $100,000 for the benefit thus conferred!

Upon trial the court dismissed the claim of Utility against Dream House and the individual directors of the School District, but at the same time entered judgment in favor of Utility against the School District in the amount of $11,187.20. In connection with the School District's counterclaim against Utility the court entered judgment in favor of the School District in the amount of $1,000. The present writ of error relates only to the propriety of the judgment against the School District in favor of Utility in the sum of $11,187.20.

The evidence as to the terms of the contract of purchase by the School District of the acreage from Dream House is in conflict. The president of Dream House testified that on numerous occasions from 1957 to 1959 he appeared at meetings of the directors of the School District for the purpose of discussing the possible purchase of land from Dream House by the School District. He stated that Dream House's "offer" was that it would sell the 7 acres to the School District for $1,400 per acre, this figure breaking down to about $400 per lot. This witness went on to explain that he very carefully and repeatedly advised the directors of the School District that Dream House was itself under contractual obligation to Utility and that their offer to sell land to the School District was conditioned upon the School

District assuming said obligation insofar as such pertained to any acreage purchased by the School District.

It was brought out that on several occasions the president of Utility even accompanied the president of Dream House to these meetings so that the former would be available to explain the nature and amount of this charge for the installation of utilities, street grading, and the like. At these various meetings, according to these two witnesses, the directors of the School District were informed that though the charge would be substantially less than "$939.36 per site" quoted in the contract, because certain work would be unnecessary since the 7 acres were being acquired for school purposes and not for residential use, that nevertheless there would be a "per lot charge" for the expense of installation of utilities, street grading, and the like.

Also, the minutes of the several meetings of the directors of the School District affirmatively show that there was discussion as to the "estimated cost for improvements," which included such items as "paving, gutter, water and sewer share, curbs and gutters" and the like. In conclusion, the president of Dream House flatly testified that "the School Board agreed to purchase the land on the terms presented."

The directors of the School Board generally denied *any* agreement to assume *any* obligation to pay *any* sum to Utility, the School District's "theory of the case" being that it agreed to buy 7 acres of land from Dream House for $1,400 per acre, that this land was conveyed to it by Dream House in February 1959 and in return Dream House was paid at the rate of $1,400 per acre.

As noted above, the trial court found that the School District was contractually obligated to Utility in the amount of $11,187.20. The School District does not take issue with the amount of the judgment, its basic position being that there is simply no contractual relationship between itself and Utility and that accordingly it is in nowise obligated to Utility for any sum whatsoever.

At the outset it should be noted that there is no dispute as to whether the School District had the requisite authority to purchase the land here in question. It concededly did, and the only issue pertains to the terms of the purchase agreement. The School District emphasizes that it was not a signatory to the contract of July 29, 1955, between Utility and Northfield, Dream House's predecessor in interest, and suggests that this fact resolves the entire controversy. This would seem to be oversimplification and to beg the question.

Utility urges that the real issue involves a determination as to just what *were* the terms of the purchase agreement between the School District and Dream House and contends that it did establish, *prima facie*, that the School District understood and agreed that in purchasing the land from Dream House for $1400 per acre it also obligated itself, either expressly or impliedly, to pay Utility that share of the total utility installation expense properly attributable to the land purchased, i.e. 7 acres representing 400 lots. It argues that it would be improbable, as well as highly unprofitable, for Dream House to sell lots to the School District at $400 per lot, and at the same time remain obligated to pay Utility a sum considerably in excess of $400 for every lot so sold. Finally, it is pointed out that it would be inequitable and most unjust to permit the School District to retain and enjoy the varied benefits flowing from the services rendered by Utility without paying its proportionate share of the expense thereof, citing *Mountjoy v. Cheyenne County High School District*, 78 Colo. 162, 240 P. 464.

In our view this is but another instance of a disputed issue of fact being resolved by a trial court sitting as the trier of the facts. In such situation this Court is simply not at liberty to set aside the findings of the trial court if there be competent evidence to support the same. See *Andersen-Randolph Co., Inc., v. Taylor*, 146 Colo. 170, 361 P. (2d) 142. In the instant

casë there is ample competent evidence to support the finding of the trial court that the School District was "obligated" by contract, be it express or implied, to Utility in the sum of $11,187.20.

The terms of the purchase agreement having been thus determined, such is for all practical purposes dispositive of the matter. Suffice it to say that other grounds urged by the School District have been considered and found to be without merit.

Judgment affirmed.

MR. JUSTICE MOORE and MR. JUSTICE PRINGLE not participating.